**SO ORDERED.**
**SIGNED this 4th day of October, 2011**

THIS ORDER HAS BEEN ENTERED ON THE DOCKET.
PLEASE SEE DOCKET FOR ENTRY DATE.

_Shelley D. Rucker_
Shelley D. Rucker
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:

CHARLES J. SPURLING and                            No. 09-17970
CAROLYN SUE SPURLING,                              Chapter 7 Debtor
Debtors;

RICHARD P. JAHN, JR., Trustee
                    Plaintiff,

v                                                  Adversary Proceeding
                                                   No. 10-1393

CHARLES J. SPURLING and
CAROLYN SUE SPURLING,
                    Defendants.

MEMORANDUM

In this adversary proceeding the Trustee, Richard P. Jahn, Jr. ("Plaintiff" or "Trustee")

asks the court to deny the discharge of the Debtors, Charles J. Spurling ("Mr. Spurling") and

Carolyn Sue Spurling ("Mrs. Spurling"; collectively "Debtors" or "Defendants"), for concealing

1

property from their creditors pursuant to 11 U.S.C. § 727(a)(2)(A) and/or making false oaths or

accountings pursuant to § 727(a)(4)(A). The Debtors deny that they engaged in conduct

prohibited by §§ 727(a)(2)(A) and 727(a)(4)(A) and assert that they are entitled to a discharge

pursuant to Chapter 7 of the Bankruptcy Code. The case involves the application of

straightforward legal standards to a series of complicated and confusing transactions and

representations made by the Debtors and members of their family. Specifically, the issue for the

court is whether the Debtors were truthful in their representations about their ownership of

several tracts of real property in the property records of Tennessee, and in their disclosures of

their income and property ownership in their petition and schedules. If the court finds that they

were not, then the court must determine whether the misrepresentations were intended to mislead

their creditors both before and after they filed for relief in this court. For the reasons stated

below, the court finds that the Debtors were not truthful and that their misrepresentations were

intended to mask the reality of their financial situation. Therefore, the discharge of the Debtors

will be denied.

I.      Facts

   A.  The Bankruptcy Filings

   1.  Execution of the Petition and Schedules.

The Debtors filed their Chapter 7 petition for bankruptcy on December 11, 2009. [Case

Doc. No.1].[1] Mr. Spurling testified that he completed only the third grade in his formal

education and estimated that he reads at a first grade level. He did admit that he was "pretty good

in math." When he filed bankruptcy, he was not able to read the petition and schedules so they

were read to him by his counsel before he signed them. He was not sure whether his wife was in

---

[1] All docket numbers will refer to the docket for adversary proceeding number 10-1393 unless otherwise specified.
References to the "case" will refer to the Chapter 7 case docket, Case no. 09-17970.

attendance at that reading, and, to his knowledge, she did not examine the schedules.  She was present at trial, but she did not testify. Counsel, who represented both Mr. and Mrs. Spurling, argued that she was a debtor in the case and should be granted a discharge. The Trustee has not challenged whether she should be a part of this proceeding, and Mrs. Spurling has not asked that she be dismissed on the basis that she never intended to file. Therefore, the court will treat Mrs. Spurling as having participated in filing the petition, and accompanying schedules and statement of financial affairs, and having signed the filing documents as her electronic signature appears. Mr. and Mrs. Spurling's signatures appear electronically in the declaration concerning Debtors' schedules. Trial Exhibit ("Trial Ex.") 1, Schedules at 24.

At trial the Trustee also offered affidavits by the Debtors representing that the Debtors were not required to file tax returns.  Mr. Spurling admitted that he had signed Mrs. Spurling's name on her affidavit, despite the acknowledgement that Mrs. Spurling had appeared personally before Ms. Lisa Burris, a notary public. Trial Ex. 2, Tax Affidavits of Charles J. Spurling and Carolyn Sue Spurling.  Mr. Spurling testified that he was able to sign for his wife because he had her power of attorney, although no written power of attorney was ever offered at trial.[2]

### 2.  Assets and Income Listed

The assets listed in the Debtors' schedules include only four tracts of real property and some personal property.  Trial Ex. 1, Schedules at 6. One tract is located at 432 County Road 783, Etowah, Tennessee.  It is the Debtors' home where they live with their 37-year-old son Mike, (who is also referred to as "Mikey"), the Debtors' aunt, three adopted children, and their granddaughter.[3]  Schedule A reflects that the home is owned jointly by the Debtors with a third

---

[2] Mr. Spurling's practice of signing other family members' names on documents which he allegedly cannot read and without a written power of attorney runs throughout the Debtors' transactions prior to the filing of the Debtors' case.
[3] Mr. Spurling testified that he adopted three children who were the children of one of his son's close friends. Schedule I lists two adopted children and a granddaughter. There is some confusion in the record regarding whether

party.  Trial Ex. 1, Schedules at 6.  As for personal property, the Debtors list $1500 in cash and

an account at 1st Volunteer Bank with $100.  They list household furnishings, two older model

vehicles, some chickens and a horse.  No farm or construction equipment is listed.  *Id.* at 9.

In the Debtors' statement of financial affairs, the Debtors state that they have received

$0.00 income from employment or the operation of a business.  Trial Ex. 1, Schedules at 25*,*

Statement of Financial Affairs, Question 1.  They state that they have received no income from

any other source. *Id.,* Question 2.  Schedule I does show their current income coming from $340

in rent and social security payments for themselves and their children totaling $2413.40.

Schedule J reflects that their expenses are $3022 of which $476 is their house payment, $250 is

the mortgage payment on the rental house and $200 is the payment on the burial lots. They list

one transfer out of the ordinary course of business in the two years preceding the filing. That is a

transfer of 5 acres to Mr. Randy Jack in exchange for payment of a note for $20,000 owed to

Charles Sloan by Mr. Spurling plus a payment of $7000. Since the Debtors have stated that they

have no income from any other business, they listed this sale of real estate as being a transfer out

of the ordinary course of business. The court would therefore expect that every real estate sale

made by the Debtors during this period would qualify as one that should be listed in response to

this question.

In response to Question 7, the Debtors state that they had made no gifts to family

members in excess of $200 during the one year period prior to filing. Trial Ex. 1, Schedules at

---

there are three or four minors residing with the defendants. Trial Ex. 1, Schedule I. Mr. Spurling also testified that he
had five sons. James and Richard have passed away. The surviving sons are Mike, Charles, and Bobby. Charles lives
next door to the Debtors, and Bobby lives in a house nominally owned by Mike at 227 Co. Rd.118, Riceville
Tennessee. There is an uncle James Spurling and a cousin James Spurling. The cousin lives in a house nominally
owned by Mike.  James R. Spurling was also previously a debtor in this court and his schedules reflect that he rents
a home at 132 County Road 783 in Etowah, Tennessee from Mike Spurling. *In re James R. Spurling and wife
Catherine J. Spurling*, Case no. 07-12320, Doc. No. 1, Schedule G, p. 20.

26, Statement of Financial Affairs, Question 7. In response to Question 14, the Debtors state that they neither hold nor control any property for another person. *Id.* at 27.

From a review of the schedules, the largest debt the Debtors are seeking to discharge is a jury verdict in a case filed by Jennifer Wallis, *et al.* ("Wallis Creditors") against Mr. and Mrs. Spurling. The judgment, in excess of $1,000,000, arose from a lawsuit filed in McMinn County. The Wallis Creditors sought damages for an automobile accident which occurred in 2002. The lawsuit was filed in 2003. A judgment was entered against Mr. Spurling on November 12, 2009, approximately one month before the bankruptcy filing. Mr. Spurling testified that this judgment was the main reason he filed bankruptcy. Mrs. Spurling was also named in the suit; however, the claims against her were dismissed with prejudice. Trial Ex.1, Schedules at 26; Proof of Claim of Jennifer Wallis at 7, Claim No. 4-1.

### B. The Family Business

A different picture of the Debtors' financial affairs emerged at trial. The Trustee contends that the Spurlings and their family now operate, and have for years operated, a significant real estate business which was not disclosed by the Debtors in this bankruptcy or by their son Charles W. Spurling ("Charles W."), who filed bankruptcy four years before these Debtors did. *See* Trial Ex. 2, Petition and Schedules for Charles W. and Lois Spurling, Case no. 04-16073, (Bankr. E.D. Tenn. 2004) (Richard P. Jahn, Trustee). Mr. Spurling manages around 40 properties located in at least four counties in Tennessee registered in the names of Charles J. Spurling, Charles J. and Caroline Spurling, Charles Spurling, Charles W. Spurling and Mike Spurling. The specifics of the ownership are discussed in detail in Section I. C. below.

The evidence presented at trial shows that the business consists of the purchase and sale of real property by the Spurlings directly or through the use of installment land sales contracts. With the assistance of several attorneys and financing from Charles Sloan and Fred and Ila Blan

Key, generally at the rate of 11%, Mr. Spurling negotiated the acquisition of a number of

properties on which small houses or mobile homes were located.  Many of these properties were

either sold to third parties pursuant to an Installment Sale Contract which accrued interest at

12%, or rented to third parties or relatives. The Installment Sales Contracts amortized over long

periods of time, some as long as 20 or 30 years. Other properties just had tenants who paid rent.

See Trial Ex. 12, Documentation for 1541 Fezzell Road.

        The business generates significant cash flow which is handled in the following manner.

The Debtor testified that several of the purchasers and tenants pay in cash. The amounts due are

collected by Mr. Spurling and his son Mike.  Occasionally, Charles W. collects rent. Mrs.

Spurling prepares the bank deposits.  To the extent the collections are deposited into an account,

it is a bank account in the name of Mike Spurling.  The monthly deposits are regularly $15,000

or more.  No party presented an accounting for the collections that were cash. The Debtors, as

well as Mike, had access to the funds that were in Mike's account. Mr. and Mrs. Spurling could

write checks on the account, and withdrew substantial sums from the account during the years

2007 through 2009.  Trial Ex. 26, Checks from Mike Spurling – 2007; Trial Ex. 27, Statements

from Mike Spurling's Account – 2008; Trial Ex. 28, Selected Checks and Deposits/Statements

from Mike Spurling's Account for 2009. The total payments to the Debtors directly totaled

$46,500 for the period from January 18, 2007 to November 24, 2009.[4] At least one payment of

$1500 was made to Mr. Spurling's attorney, Larry Nolen, who represented him in the Wallis

litigation and on numerous other real estate transactions.[5]

---

[4] There are a number of other checks included in Trial Exs. 26, 27 and 28 which have the name of the payee
redacted. The Trustee did not put on proof that these checks were also paid for the Debtors' benefit and so the court
has not included them in its calculation of benefits taken from Mike Spurling's account by the Debtors.

[5] The court finds it unusual that there are no other payments to attorneys reflected in the checks for the Debtors'
litigation with the Wallis Creditors which continued for almost 7 years and was tried during the year before the
filing. The schedules do not reflect any payment to attorneys except for bankruptcy counseling nor is Mr. Nolen
listed as a creditor.

Despite the significant value of this real estate and the substantial cash flow, no member of the Spurling family reports the income from the real estate sales or the rent or the installment payments on their income tax returns. Mr. and Mrs. Spurling file no tax returns. Mike reports only his wages from his hourly job as a forklift driver at Duracell Corporation. Son Charles W. reports only his wages from his job as a welding tech at Whirlpool Corporation.

With respect to the use of the collections to pay creditors, no written records of the loan payments to one of the lenders, Sloan, exist because, as Mr. Spurling testified, "Mr. Sloan liked to receive his payments in cash."  Mr. Spurling testified that he had no idea how Mr. Sloan kept his records.

Unlike Sloan, the other lenders, the Keys, accepted payments on their notes by checks and their daughter provided the Spurlings with detailed receipts twice a month for the payments made on those properties which her parents financed. Trial Ex. 31, Monthly Receipts from the Keys. These receipts show payments from Mr. Spurling on over 25 different tracts in the month of March 2009 alone. For the period 2009 to 2010, the monthly payments are approximately $5900. The receipts all show that the funds are received from "Charles Spurling." *Id.*  Mike testified that his father kept track of what was owed to Ms. Key in a book that showed what was owed on all of the properties.  That book was not produced at trial.

In addition to income generated from real property, there also appear to be transactions involving livestock, equipment, and vehicles. Mr. Spurling and Mike Spurling[6] also a have receipt book which shows that there were transactions with James Spurling, either the cousin or the uncle, involving livestock, automobiles and a tractor during the years 2006 to 2009.  Trial Ex. J, Receipts of Mike Spurling.

---

[6]  Mike Spurling testified that he and his father kept the receipt book, and there appear to be several different handwriting samples on the receipts.  See Trial Ex. J, Receipt Book.

Mr. Spurling denied he received any benefit from the real property because he did not

live on them and he put no proceeds from the property into his account. He also testified that he

only took money out when he needed to buy something that Mike needed or wanted; however,

the court notes that there were few if any references on the checks ranging from $100 to $4000,

payable to him or Mrs. Spurling which indicated how the funds were to be used.  Mr. Spurling

generally responded to cross examination by the Trustee about his omissions of transactions with

his sons that those matters were between family members and he did not think they needed to be

included.

### C.  Ownership or Transfer of Specific Properties

The Debtors denied at trial any ownership in any asset which was not held in the name of

either Charles J. Spurling or Charles J. Spurling and Carolyn Spurling. The Trustee contends that

any property in the name of Charles Spurling also belongs to the Debtor and that the properties

held in Mike's or Charles W.'s name are also beneficially owned by the Debtors. With respect to

properties held in the name of Charles Spurling, the Trustee makes a persuasive case.  The court

will now review *infra* the evidence pertaining to the ownership of various properties at issue in

this proceeding.

### 1.  Lot 6 Ila Blan Subdivision (250 County Road 179) McMinn County -  Melissa Tharpe[7]

Mr. Spurling and his son testified that this property belonged to Charles W. The

documents show that Ms. Tharpe transferred this tract to "Charles Spurling" on or about May 10,

2002, by deed of assumption for assumption of a note to Ila Blan Key.  Trial Ex. 5, Deed of

Assumption.  Mr. Spurling, not his son, signed the affidavit of value on the deed, which was

notarized by the register of deeds, Nadean Cunningham. *Id*. at 2.  There is no indication that he

---

[7] The typed name in the deed is spelled Tharte, however the signature appears to be Tharpe. Trial Ex. 5, Deed of
Assumption at 2. The court will use Tharpe.

signed in a representative capacity.  The tax statement is to be sent to the Debtors' address.

Although Charles W. testified that this property was his, he could not remember the name of the

person from whom he purchased it nor did he list it in his schedules as his property in his 2004

bankruptcy.  Trial Ex. 3, Schedules of Charles W. at 6.  Charles W. did testify that he signed a

note to Fred Key, but the note admitted as evidence is the note between Ms. Tharpe and Mr. Key.

Trial Ex. 5, Supplement, Note.    To create further confusion, there is an amortization attached to

the note that is headed "Mike Spurling." If the payments had been made, the balance at the time

the case was filed would have been less than $4000. This property also appears on the Key

Receipts which notes the payments are from "Charles Spurling."  Trial Ex. 31 at 1.

Ms. Linda Steader, a friend of the Debtors, testified that she had an installment sale

contract on this property with Charles W. and on another property with Mike. Although she does

not live on the property, she does make the payments on the contracts. She testified that Mr. or

Mrs. Spurling, or Mike collected the payments, which she makes in cash. She did not know what

was done with the cash after she paid.  She could not say who had signed her contract since she

had lost the contract. She recalled that she signed it at a lawyer's office but she did not see the

Spurlings sign.

Charles W. testified that he received the payments from Ms. Steader, but his father and

brother, Mike collected it for him. He testified that it was deposited to Mike's account.  Contrary

to the testimony he gave at the trial, he did not disclose ownership of this property or any income

on his schedules in 2004.  Charles W. believes that the note to Mrs. Key was paid off. When

asked to identify the note between Mrs. Key and Ms. Tharpe, Charles W. could not identify who

Ms. Tharpe was.

### 2.   County Road 213,  McMinn County

On January 3, 1995, Fred and Ila Key transferred two parcels to "Charles Spurling." Trial Ex. 6, Warranty Deed. The deed was prepared by an attorney Thomas M. Boyd.  Mr. Spurling, in his individual capacity, signed the affidavit of value, notarized by Nadean Cunningham, and the tax bills are to be sent to the Debtors' address.  *Id*. at 1.  Mr. Spurling testified that the Keys sold **him** two tracts totaling 13 acres. He admitted that **he** sold some of the property, but contended that Charles W. now owns the remaining 5.85 acres.  Later when testifying about this property, Mr. Spurling explained that "Him [Charles W.] and me and Mr. Key put it together for him [Charles W.]."  Charles W. confirmed that he owned this property. However, he was not sure how many acres it was; he did not list this property on his schedules in 2004; and he did not list any income coming from this property at that time. The court finds that Mr. Spurling, rather than Charles W., owns, operates and controls this property.

### 3.   234 County Road 725, Riceville, Tennessee

This is second parcel transferred in 1995 from Fred and Ila Key.  They transferred two parcels of property to "Charles Spurling ."  Trial Ex. 9, Warranty Deed.  As noted with the prior tract discussed, the affidavit of value was signed by Mr. Spurling, individually, and notarized by Nadean Cunningham.  Tax bills are to be sent to the Debtors' address. The tax record shows the property to be owned by Charles Spurling for Danny Duggan.  Mr. Spurling acknowledged that this property is where Danny Duggan formerly lived. The current tenant is Bo Freeman.

Mr. Freeman testified that he was buying the property from Charles W. He also testified that when he made his payments, he paid them to Mike usually but also Charles W. and Mr. Spurling. His installment sale contract was introduced.  Trial Ex. A, Freeman Installment Contract.   Charles W. also testified that this was his property but it was not listed on his

bankruptcy schedules nor did he reflect any income from either Mr. Duggan or Mr. Freeman on his schedules.

### 4.  211 County Road 725, McMinn County

On or about June 17, 2003, the Smiths conveyed a tract designated as 211 County Road 725 to "Charles Spurling" by a warranty deed prepared by attorney William McKenzie. Trial Ex. 7, Warranty Deed.  Mr. Spurling testified that this "Charles Spurling" was Charles W.; however, Mr. Spurling, individually, signed the affidavit of value, acknowledged by Nadean Cunningham. The tax statement comes to the Debtors' residence.  The Debtor testified at first that he was not sure which tract in Riceville, Tennessee, that this was.  He said, "725. That would be in Riceville. And what I'm a telling you is that I've got—my sons have got four or five tracts on 725."  Mr. Spurling testified that the property might be under a land sale contract with Sam Goren, which was one of the few mistakes Mr. Spurling made in describing the tenants on the properties.  He testified that different family members pick up the payments.

The Debtors called Buddy Arwood, who testified that he had entered into an installment sale contract on this tract with "Charles Spurling" in August of 2005. He pays $400 a month in cash on the 35 year contract.  He testified that he had negotiated with Mr. Spurling for the purchase of this land, and that Mr. Spurling had even arranged for the combination of two tracts to be sold to Mr. Arwood. One was for approximately .7 acres and the other adjacent tract was for .5 acres. When he later received his tax statement, he had been surprised to see that it was not Mr. Spurling whose name appeared on the tax statement but Mike's. Mr. Arwood questioned Mr. Spurling about Mike's name appearing on the statement.  Mr. Spurling had then explained to him that the property was Mike's.

Although Mr. Arwood never mentioned any involvement by Charles W. in his negotiations with the Spurling, on cross examination, Charles W. testified that this was his property. As with several other properties he now claims to own, he did not list it on his Schedules in 2004 or show any income from this property at that time.   The court finds that at least a portion of this property under Mr. Arwood's contract, specifically the .7 acre tract obtained from the Smiths, is owned by Mr. Spurling. The record at trial is unclear about who owns the .5 acre tract since no deed was offered as evidence.

### 5.   176 County Road 158, Riceville, Tennessee

Bankers Trust Company of CA as trustee for UCFC Trust conveyed two tracts to "Charles Spurling" on April 16, 2002. Trial Ex. 8, Special Warranty Deed; *see also*, Trial Ex. 15. Mr. Spurling's signature does not appear on this deed. He testified that Charles W. bought this property.  However, on March 18, 2008, Mr. Spurling, not Charles W. executed a warranty deed for the second parcel to Randy and Regina Jack for $10,000.  The deed was prepared by Larry B. Nolen, his attorney for this transaction and also for his lawsuit with the Wallis Creditors. Two years later, Mr. Nolen was also the bankruptcy attorney for Charles W. Mr. Spurling, in his individual capacity, signed the deed, and it was notarized by Suzie Toomey, acknowledging that "Charles Spurling, the within named bargainor, with whom I am personally acquainted, and who acknowledged that they[sic] executed the foregoing instrument for the purposes therein contained." Trial Ex. 8, Warranty Deed at 2.  Mr. Spurling signed the affidavit of value on the document. The Debtors failed to disclose this transaction on their schedules as a transfer within two years of the filing date. Trial Ex. 1, Statement of Financial Affairs.

 Mr. Spurling testified that Mr. Jack also has a land contract on the remaining parcel.  On February 2, 2004, "Charles Spurling" executed an Installment Sale Contract with Randy Jack for

$22,000. Mr. Spurling signed the contract. Trial Ex. C, Supplement to Ex. 9. Nowhere is there an indication that Charles W. has an interest in this property. Also, he never listed this property in his bankruptcy schedules in 2004 nor reflected any income at that time. Nevertheless, both Mr. Spurling and Charles W. testified that this was Charles W.'s property. The court does not find this testimony credible.

### 6. 1430 Nebo Road, Meigs County

On January 29, 2003, for $2,500, Anita Walden conveyed a tract of real property to "Charles Spurling." Trial Ex. 10, Warranty Deed. The deed was prepared by attorney William McKenzie, notarized by Mr. McKenzie, and the affidavit of value was signed by both Mr. McKenzie and Mr. Spurling. The affidavit of value is notarized but it is not clear, whether Janie B. Stiner, the register of deeds, notarized Mr. Spurling or Mr. McKenzie's signature. *Id.* at 2. On March 27, 2003, "Charles Spurling" entered into an installment sales contract with Dennis and Gazella Torbett for $25,200, payable in installments of $260 a month at 12% until paid in full. Mr. Spurling signed the contract and Mr. McKenzie acknowledged that "Charles Spurling, the bargainor, . . . acknowledged that he executed the within instrument for the purposes therein contained." Trial Ex. 10, Installment Sale Contract. At trial, Mr. Spurling testified that he signed the contract, but the property was purchased for his son who gave his permission for Mr. Spurling to sign because Charles W. was at work. However, there is no indication on the face of the document or the public record that Mr. Spurling was acting in a representative capacity in either the purchase or the sale of the tract. The tax record reflects the Debtors' residence as the place for the tax statement to be sent. Trial Ex. 10, Tax Report. In addition, the installment payments, when collected, are deposited into Mike Spurling's account. Neither ownership of

this parcel nor the income from the Torbetts' payments appeared on Charles W.'s schedules in 2004. The court finds that this property belongs to Mr. Spurling.

### 7.   1580 Fezzell Road (Lot 7 Darrell Murray Subdivision), McMinn County

On March 20, 2003, Mrs. Key transferred 5.15 acres to "Charles Spurling."  Trial Ex. 11, Warranty Deed.  The deed was prepared by Mr. McKenzie, and the affidavit of value showing a value of $19,000 was signed by Mr. Spurling and notarized by Ms. Stiner.  Mrs. Key financed the purchase, and Mr. McKenzie prepared a deed of trust, which Mr. Spurling signed in his individual capacity and Mr. McKenzie notarized the signature as being that of Mr. Spurling. Trial Ex. 11, Deed of Trust.  On the same day, Mr. Spurling also signed a promissory note to Mrs. Key. Trial Ex. 11, Note.  The Key Receipts reflect the payments on this property. Trial Ex. 31 at 2. Despite there being no indication that Charles W. was involved, Mr. Spurling testified that this purchase was made for his son.

On March 21, 2003, Mr. Spurling signing as "Charles Spurling," executed an installment sales contract with Joseph Quinn.  Melissa Johnson notarized Mr. Spurling's signature without any designation that Mr. Spurling was signing in a representative capacity.  *Id.*  The Tax Report reflects that the property is owned by Charles Spurling in care of Joseph Quinn, Jr.  Mr. Quinn testified that he purchased the property from Charles W.  Mr. Quinn was the only tenant who testified that he actually talked to Charles W. about his purchase. However, even he testified that, when he signed the contract in his driveway, it was Mr. Spurling who executed the contract. Charles W. testified that this was his property although he did not list the property as an asset or show the installment payments as income in his 2004 schedules.

### 8.   1541 Fezzell Road (Lot 10 Darrell Murray Subdivision), Meigs County

On June 29, 2002, Ila Blan Key and Chris Cronan conveyed a tract of property to Charles J. Spurling and Carolyn Spurling. Trial Ex. 12, Warranty Deed.  The deed was prepared by William McKenzie, who also signed the affidavit of value showing a value of $21,079.94. Neither of the Debtors' signatures appears on the deed.  On July 6, 2002, the Debtors executed an installment sales contract for $39,000 with William and Evelyn Partain.  The contract was payable in installments of $375 a month at a rate of 12%.  Trial Ex. 12, Installment Sales Contract.  Mr. Spurling signed the contract as Charles Spurling and testified that he signed for his wife with her permission.[8]   Mr. McKenzie notarized their signatures, but the acknowledgement showed no party signing in a representative capacity. No middle initial was used for Mr. Spurling.  The Spurlings also financed this purchase with Ila Key and executed a note and a deed of trust for the property.  Again, Mr. Spurling signed all of the loan documents for himself and his wife.  On the deed of trust, Mr. McKenzie failed to indicate that Carolyn Spurling was not present.  When the Debtors listed this property on their schedules, they used an incorrect address which reflected that this property was located on County Road 783. Mr. Spurling testified that the inaccurate address was an "honest mistake."  County Road 783 will be discussed further in section C.15 below.

### 9.   869 Benton Station Road (Lot 14 Epperson Acres), Polk County

On March 20, 2001, John Paul Lewis and S. Lorine Lewis sold six tracts of land in Epperson Acres to "Charles Spurling and wife, Carolyn Spurling."  Trial Ex. 13, Deed.  Mr. Spurling signed the affidavit of value declaring that the property was worth $56,000.  The Debtor admitted that he and his wife were the owners of this property.   Of the six lots, four were sold to

---

[8]  Given the haphazard way in which these documents were executed, the court does not know what weight to give to acknowledgements by Mr. McKenzie's office.

one party, another was sold to a second party, which left the Debtors with one tract. All of these

sales were made by Mr. Spurling signing as "Charles Spurling," no middle initial indicated.

Trial Ex. 13, Deed to Blair, Deed to Allen.

On April 9, 2007, an installment sales contract was executed by the Debtors with

Matthew and Connie Bawgus. It is unusual for two reasons. First, the seller in the contract is

Mike Spurling although there is no deed transferring the Debtors' interest to Mike. Second,

Charles Spurling signs for Mike in his representative capacity which is shown in the signature

line and in the acknowledgement notarized by Suzie Toomey on the document prepared by Larry

Nolen. At the trial, Mr. Spurling explained Mike's involvement by testifying that Mike owned

the property as a result of his holding a deed of trust on the property.  The trust deed was

introduced at trial. Trial Ex. 13, Contract-of-Sale-and-Purchase.  The Debtor testified that he had

made a "fair trade" with Mike for a deed of trust for $35,000, but that he did not list that debt

because "it's between a father and a son and we trust each other."  Mr. Spurling kept no record to

show how much was still owed to his son.  His payments to his son consist of putting the

installment sale payments into Mike's account.  The Debtors' attorney recalled Mr. Spurling and

asked him about his understanding of the deed of trust. He explained that he had meant to convey

the property to Mike for the $35,000 rather than just giving him a deed of trust to secure a loan

from him. Mr. Spurling claimed that he did not know the difference between a deed and trust

deed and that he relied on the attorneys to tell him what he was signing. His attorney argued that

since it was supposed to be a conveyance, there was no debt to list on the schedule.  The court

finds this second explanation inadequate given the significant number of transactions in which

Mr. Spurling engaged and the use of a trusted family attorney on this matter. The court finds his

explanation that he was aware of it, but did not list it because it involved family to be consistent with his pattern of omissions.

### 10. Lot 3 Parks Acres, McMinn County

Carolyn Spurling owned properties in her own name until she conveyed them to Mike in 2004.  About three months after Charles W. filed for bankruptcy, on December 22, 2004, by deed, Mrs. Spurling conveyed this tract to Mike Spurling for $800.00.  Trial Ex. 14, Deed. Suzie Toomey notarized her signature on the deed prepared by Larry Nolen.

Mrs. Spurling had purchased the property from Ila Key for $19,000 in 2001.  Mr. Spurling signed the affidavit of value on this deed, notarized by the McMinn County Register. To finance her original purchase of the property, she had signed a note and a deed of trust in favor of Ila Key.  Her signature on the deed of trust was notarized by William McKenzie. She rented the property until the renters were arrested for manufacturing methamphetamine, and the trailer on the property was confiscated. Mr. Spurling testified that his wife did not have a way to pay the note to Mrs. Key and they did not want the property to go back to the Keys. Although there was a pattern of commingling money and proceeds from sales and rent, Mr. Spurling's testimony is that Mrs. Spurling was at risk of losing this property after the rental trailer was destroyed because she had no way to make the payments. The court is skeptical of this explanation given the pattern of commingling money and proceeds from sales and rent in every other transaction between family members.  Mr. Spurling testified that his wife wanted Mike to take over the payments so he could make the money on the property instead of Mr. Key.  There was no documentation presented that evidenced Mike's assumption of the loan.  Payments on this note are included in the payments for which the Keys gave Charles Spurling a receipt. Trial Ex. 31 at 2. From the record, Mrs. Spurling appears to continue to be liable on the note. When

17

the Trustee asked Mr. Spurling why his wife did not list this debt, Mr. Spurling testified that "it was on account of mother and son and they trust each other."  Mrs. Spurling, although present in the courtroom throughout her husband's testimony, never took the stand to explain or correct or elaborate on Mr. Spurling's statements about her reasons for the transfer or the omission from her bankruptcy schedules.

### 11. 626 County Road 655,  McMinn County

On June 2, 2005, Charles W. Spurling conveyed two tracts to Benny Ray and Connie Fritts for $40,000. Trial Ex. 16, Warranty Deed.  Mr. Spurling recalled the sale and acknowledged that he signed the sale contract. His signature was notarized by an attorney, John Linn as being that of Charles W.; but there is no indication that Mr. Spurling was signing in a representative capacity.  Mr. Spurling testified his son may have bought the property from Mr. Key in 1996.  The legal description of the property which is attached to the installment sale contract indicates that one tract of the property was conveyed to "Charles Spurling" in 1996 by Fred Key and Roy Holmes. The second tract was conveyed to Charles W. Spurling by Russell Smith on January 15, 1997. When Charles W. filed for bankruptcy in 2004, he failed to show ownership of either tract in his schedules.

### 12.  24 Cross Creek (102 County Road 179), McMinn County

On November 27, 1999, Charles W. and wife Lois transferred this property, which was their home, to the Debtors by Quitclaim Deed.  Trial Ex. 17, 1999  Quitclaim Deed. About the same time, they moved next door to the Debtors at 440 County Road 783. On September 14, 2005, about one year after their son's bankruptcy, Mr. and Mrs. Spurling transferred the property back to Charles W. Spurling by Quitclaim Deed.  Trial Ex. 17, 2005 Quitclaim Deed.  *Id*.  Mr. Spurling testified that the consideration was a trade, although he was not specific about what was

18

given or what was received. The property is under an installment sale contract with Patricia

Stockwell.  Various family members collect the payments which are deposited into Mike

Spurling's account.  The land contract was not offered as an exhibit so there was no evidence

presented about who signed or negotiated the contract with Ms. Stockwell.

### 13. County Road 803, McMinn County

On July 31, 2003, Edna Renea Escobar and Jesus Escobar conveyed a tract of real

property to Charles J. Spurling and wife Carolyn Spurling.  Trial Ex. 18, 2003 Warranty Deed.

On September 25, 2005, the Debtors conveyed the property to James Benny Fritz.  *Id.*, 2005

Warranty Deed.  Larry Nolen prepared the deed, and Mr. Spurling signed it for himself and Mrs.

Spurling. Suzie Toomey notarized the signatures as though both Mr. Spurling and his wife had

been present. *Id.*

In September 2008, Benny Fritts [9] conveyed the property to Mike Spurling, by warranty

deed prepared by Larry Nolen. Mr. Spurling signed the affidavit of value for $10,000.  The tax

report showed the tax appraisal for the land and improvements was $20,500.  *Id.* Tax Report.

There was no testimony regarding whether the property was subject to an installment sales

contract. There is no deed of trust against the property.  Mr. Spurling denied that this property,

when it was acquired in 2005, was put in Mike's name for Mr. Spurling's benefit. The Debtors'

counsel points to the original acquisition as proof that the Debtors were still acquiring property

in their names in 2003 after the Wallis litigation had begun. The court finds that the Debtors'

argument would have been more persuasive had the property returned to the Debtors a year later.

---

[9] The testimony at trial leads the court to believe that this Benny Fritts is the same party to whom the Debtors
conveyed the property in 2005. The court would note that his last name is no longer spelled with a 'z' nor does he
use the name the first name of James.

### 14. County Road 796, McMinn County

On February 6, 2009, Wells Fargo Financial Tennessee 1 LLC conveyed a tract to "Charles Spurling, a married man." Trial Ex. 19, Corporate Special Warranty Deed. The owner's name is given as Charles Spurling with an address which is the Debtors' address. The tax statement address is also given as the Debtors' address. On November 15, 2006, Mr. Spurling signed a note for $16,000, secured by a deed of trust on this property, to Fred and Ila Key. However, the property was not acquired by Mr. Spurling until almost three months after the deed of trust was executed.  Despite there being no indication that Charles W. was involved in the transaction in any way, Mr. Spurling testified that this was his son's property and his son's obligation. Larry Nolen, the Debtor's attorney in the Wallis personal injury case and Charles W.'s bankruptcy attorney, prepared all of the loan documents.  Trial Ex. 18, Note and Deed of Trust.  There is no income from the property. The tax report reflects that there are no improvements on the property.  Trial Ex. 19, Tax Report.

### 15. Lot 4, Adair Acres (231 County Road 783), McMinn County

On September 10, 2009, Fred Key, by his wife with power of attorney, and Ila Key transferred this tract of property to Charles W. Spurling. Trial Ex. 20, Deed.  The property was financed by the Keys; and Mr. Spurling, not Charles W., executed the note and deed of trust in favor of the Keys as Charles W. Spurling without any power of attorney designation.  Trial Ex. 20, Deed of Trust. Once again John Linn, an attorney, notarized Mr. Spurling's signature as being that of Charles W. Spurling.  *Id.*

### 16. 815 County Road 135, McMinn County

On March 13, 2008, Scott and Carol Jack, transferred a tract of real property to Charles Spurling. Trial Ex. 21, Warranty Deed. Mr. Spurling signed the affidavit of value.  The same

20

day, Mr. Spurling signed a deed of trust to secure a debt of $15,000 to Charles Sloan.  The document was prepared by Larry Nolen, who also notarized Mr. Spurling's signature with no indication that Mr. Spurling was signing in a representative capacity. On February 17, 2009, Mr. Spurling supposedly transferred this property to his son Charles W. and Regina Jack. Trial Ex. 21, 2009 Warranty Deed at 1.  However, Charles W. and Regina Jack signed the deed and their signatures are notarized as the "bargainors" despite the fact that the document itself clearly stated that they were the purchasers.  Mr. Spurling admitted that he signed his son's name here also without any representative designation.  Despite all of these acknowledged signatures, Mr. Spurling denies he ever owned the property. This testimony raises the question why Mr. Spurling would be conveying the property to his son if he did not own it. When asked about what the deed showed about the ownership, Mr. Spurling claimed he "did not know how the deed was done that way."

Mr. Spurling's version of the transaction is that Scott Jack had a "burn out"; i.e. lost the home on the property to a fire.  After that loss, Mr. Jack sold the property to Charles W.  Charles W., wanting to rent the property but having no home on the property to rent, entered into a sort of partnership with the Jacks. Mr. Jack contributed a trailer to the property and Charles W. conveyed a 50% ownership in the property to Mrs. Jack. After the trailer was placed on the property, the joint owners entered into an installment sales contract to sell the property. After that plausible explanation, confusion returns when the court reviews the installment sales contract which shows, not Charles W., but Mr. Spurling as the half owner, signing without any indication that he is executing the document by a power of attorney for his son.

### 17. Lot 5 Hagler Estates, McMinn County

On August 27, 2004, the Pritchetts conveyed this tract of property to "Charles Spurling." Trial Ex. 22, Warranty Deed. This document was prepared by Larry Nolen, and Mr. Spurling signed for Jack Pritchett with Power of Attorney. He signed as Gary Pritchett with Power of Attorney. However, Ms. Toomey acknowledged the Pritchetts' signatures as though they were present. Approximately a year later in June of 2005, another warranty deed was executed by the Pritchetts and "Charles Spurling," in which the same property was conveyed by the three to Mike Spurling.  Mr. Spurling signed for the Pritchetts with power of attorney, for himself showing no representative capacity, and signed the affidavit of value. Mr. Spurling contends that the "Charles Spurling" listed is his son. The court simply does not believe this.  In a document apparently prepared to correct the acknowledgements of the Pritchetts to reflect powers of attorney, there is no indication that Charles W. is involved. Furthermore, the document is prepared by an attorney who knew both father and son. Given the timing of transfer to Mike, Mr. Nolen was likely to have been in the process of preparing to file bankruptcy schedules for Charles W.'s bankruptcy, which was filed two weeks later. If it was Charles W.'s property then his transfer should have been listed in his Schedules.  It was not. Trial Ex. 3, Petition and Schedules for Charles W. and Lois Spurling, Statement of Financial Affairs, Question 10.  With respect to the acknowledgements in the document, Ms. Toomey's acknowledgement correctly reflects the representative capacity of Mr. Spurling for the Pritchitts.  Based on this evidence, the court finds there is no question that Mr. Spurling and his counsel knew how to reflect when Mr. Spurling was signing in a representative capacity.

Later that year, Mr. Spurling executed an Installment Sales Contract and signed Mike Spurling's name without any indication that he was signing pursuant to a power of attorney.

This time Mr. McKenzie, not Mr. Nolen or Ms. Toomey, notarized this signature without a

power of attorney designation.

### 18. Debtors' Residence

The statement of financial affairs does not reference a transfer of an interest in the

Debtors' residence made within the two years preceding the filing of the Debtors' bankruptcy

petition.  Trial Ex. 1, Petition and Schedules at 27.  However, the records indicate that the

Debtors did in fact transfer an interest in their residence to their son Mike during this period.

Trial Ex. 4, Quitclaim Deed.  The current deed under which the Debtors own their home states

that the home is held in the names of "Charles J. Spurling and wife Carolyn S. Spurling and

Mike S. Spurling, as tenants in common with right of survivorship."  *Id.*, Quitclaim Deed. The

conveyance was made on November 7, 2008, a date well within two years prior to the filing of

the petition.  The conveyance is from Charles J. Spurling and wife Carolyn Spurling.  Mr.

Spurling testified that he and his wife changed the ownership interest at that time because that

was when they discovered that a mistake had been made.  Mr. Spurling stated that "Mike was

supposed to been [sic] there all the time."  Mr. Spurling denied that the change was motivated by

the lawsuit filed by the Wallis Creditors.

In an effort to explain why the Debtors did not believe that they needed to disclose this

transfer, Mr. Spurling offered the following explanation. The Debtors had moved to the property

in 1987 and later purchased it in 1988. At that time their son Mike, who was born in 1974, would

have been 14 years old.  Mr. Spurling testified that the reason Mike was to be added as an owner

was because Mr. Spurling traded "a trailer, a backhoe, a dozer and a dump truck in for the

property." He testified that all of this equipment belonged to Mike in 1988.  He claimed he

discovered the omission of Mike's name on the deed when he was obtaining new copies of

records to replace those records destroyed in a fire which destroyed their residence in 2005.

Despite the fire having occurred in 2005, the deed was not reviewed and the omission not

corrected until 2008.  Mr. Spurling identified a copy of a deed in which Mike's name had been

handwritten on the first page to support his statement that Mike should always have been a tenant

in common with his parents. Trial Ex. D, Warranty Deed.  Mr. Spurling took the position that

since the transfer was merely a correction, he did not think it was a transfer that needed to be

scheduled.

The court does not find the exhibit to be persuasive since there is no indication when the

Mike's name was written on the document or whether that is how the document appears in the

records of McMinn County. The Debtor never explained how his 14-year-old son came to own

all of this equipment.  To call the Debtor's contention into further question, Mike denied ever

owning this equipment, except possibly a backhoe, in his testimony.  The court finds neither the

Debtor's explanation for making the change on the deed, nor his explanation for omitting the

transfer from his schedule, to be sufficient to overcome the Trustee's contention that the failure

to list the transfer is a false oath.

### D.  Misrepresentation Regarding Equity in the Debtors' home.

The Trustee contends that the Debtors' statements in Schedules A and D indicating that

there are two deeds of trust on the residence are false. At a deposition in the case, Mr. Spurling

testified that his home was "paid for." The Debtors valued the home at $98,000 in their

Schedules. The deposition testimony is contradicted by the Schedules in which the Debtors

represent that Charles Sloan holds a first mortgage on the property for $70,000 and Household

Finance holds a second for $50,000. Copies of two mortgages were offered by the Debtors as

Exhibits E and F at trial.  At trial, Mr. Spurling testified that he owed Sloan more than $40,000.

The schedules reflect $70,000.  *Id.* at 76.  As previously noted, Sloan frequently does business with the Debtors and their family.  Mr. Spurling testified that he would pay Sloan in cash or work for him. Sometimes he would trade horses or cattle. The Debtors' counsel argued in her brief that neither Sloan nor Mr. Spurling knew exactly how much was owed because the obligation had been restructured after the 2005 fire. She also argued that the continued existence of the Sloan Deed of Trust of record should allow the court to infer that a debt exists. At trial, the Debtor explained that the amount owed to Sloan as reflected on the Schedules was accurate and that he did not intend to mislead the court or the Trustee.

A closer examination of the deposition testimony, the documents and related exhibits, and the record raises questions about the information in the Schedules. On June 21, 2010, Mr. Trew, an attorney representing the Wallises, took a deposition in which he had the following discussion with Mr. Spurling.  At trial the Trustee read the following exchange from Mr. Spurling's earlier deposition into the record:

> Q by Trew to you: You bought it [the home] in when, 1988?
> A: Now, '87 or '88, I believe, sir. Bought it through Norman Lee, traded him a backhoe, a dump truck and a dozer and some cows and everything else….
> Q: But you had it paid for?
> A: No. I made him [Mr. Lee] some payments.
> Q: All right. Did you eventually have the land paid for?
> A.  Yes, yes, yes, yes.
> Q: And when did you eventually get it paid off, if you know?
> A: I couldn't answer that, sir, I don't know.
> Q: Why did you transfer this property to create an interest with your son, Mike?
> A: Because Mike helps me all the time and he's loaned me some money to buy a vehicle with and I intend for Mike to have the place anyhow and they said it was the best way to do it.
> Q: Who did?
> A: The lawyer, ever which had drawed it up. You've got the paper. Tell me which one.
> Q (at 75): Before this transfer, by the time you did this transfer in November 2008 did you have your property paid for?
> A: Yes.

Q: And this piece of property which is now owned by you, your wife and your son at present is paid for?
A: Yes.

The exhibits offered at trial confirm that the Debtors purchased the house from Mr. Lee, Trial Ex. D, Warranty Deed. There was no evidence of seller financing offered at trial, so it appears that if Mr. Spurling believed that he was discussing the purchase from Mr. Lee, he did pay off that debt against the house. The deposition questioning does not specifically ask about other debts that may have been placed against the house that were not for its initial purchase. At the trial, Mr. Spurling testified that the debt to Sloan arose from money he borrowed to make improvements to his property such as a well and a driveway. While this explanation may be favorable to the Debtor's contention that Mr. Spurling did not intentionally make a false oath at the deposition regarding the house being "paid for," the testimony does reflect a different story about why Mike's name was added to the deed.

There are also other questions about the information reflected on Schedule A. The exhibits admitted into evidence correspond with the Debtors' representations about the names of the creditors who hold debts against the property, but raise questions about the amounts due. Based on the trial exhibits, in 1997 the Debtor borrowed some funds from Sloan. The first mortgage held by Mr. Sloan states that the original principal balance was $60,000, monthly payments of $1334.67 started on March 28, 1997, and the debt matured in March of 2002. Trial Ex. E, Deed of Trust. Mr. Spurling testified that he had restructured his payment schedule on this obligation with Sloan to reduce his monthly payment from $2600 a month. The court can find no evidence in the record to support Mr. Spurling's contention that the payments were ever $2600. The monthly payments reflected in the deed of trust were approximately half that amount. Trial Ex. E, Sloan Deed of Trust at 2. If Mr. Spurling was paying $2600 a month there must be

26

other debts. If not, it would seem that this deed of trust should have been satisfied by the date of the bankruptcy filing.

On December 12, 2001, the Debtors executed a deed of trust in favor of Household Financial Corporation.  Trial Ex. F, HFC Deed of Trust.  That Trust Deed states that it secured a Revolving Loan Agreement with a credit limit of $30,000.[10]  Paragraph 4 of the HFC Deed of Trust requires that the Borrower shall "promptly discharge any lien which has priority over this security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender." *Id.* at 2. No evidence of the writing in which HFC agreed to Sloan's superior lien was offered. The deed of trust also required the Debtors to maintain insurance on the property, and there was no testimony regarding the impact any insurance proceeds had on the 2005 fire which destroyed the Debtors' home.  Finally, the Debtors offered a payoff letter from Mr. Abid Ali of the Bankruptcy Department on HFC letterhead regarding "Carolyn S [sic] & Charles Spurling, Account no. 84260100261090."  Trial Ex. G, HFC Payoff Letter. It states that the amount required for the payoff as of February 26, 2011, is $41,023.51 and reflects that the payoff amount is $41,000.  The court notes that there is nothing on the HFC Deed of Trust that shows an account number which could be matched to the one shown on the letter. There is also a notation on the payoff letter that the Debtors "have obtained a discharge of personal liability in bankruptcy and that any payment is voluntary."  *Id.* That is clearly not the case.  Finally, the court would also take notice that Charles W. listed the address of the Debtors' home as collateral for a debt of Charles W. Spurling to Homecomings Financial, Account no. 0434904694 for $26,726.17 in his schedules.  Trial Ex. 3*, In re Charles J. and Lois Spurling*, Schedule A, Bankr. Case No. 04-16073, Doc. No. 1.  The court is left to

---

[10]  The HFC Deed of Trust states that the credit limit is $30,000 but provides for an initial advance of $31,000. Trial Ex. F at 1.

wonder if the payoff letter relates to the debt of Mr. Spurling or to a debt of Charles W., who has

received a discharge. Although the court believes that Homecomings Financial and HFC are not

the same creditor, the court's skepticism regarding the accuracy of the amount reflected as owed

is heightened by the fact that this creditor, like Sloan and the Keys, has not filed a claim in this

case.

### E.  Summary of Facts

Based on the trial exhibits there are eleven properties which the property records show

ownership in the name of "Charles Spurling." All have affidavits of value executed by Mr.

Spurling rather than his son. None of these affidavits has a designation that Mr. Spurling was

signing by a power of attorney. Tennessee law requires that to authenticate an instrument for

registration or recording in the office of the county register, "the maker or the natural person

acting on behalf of the maker shall execute the instrument or document by that person's original

signature and such signature shall be either acknowledged according to law or proved by at least

two (2) subscribing witnesses."  Tenn. Code Ann. § 66-22-101. In cases where the party acting

as an attorney in fact has not properly reflected his representative status, the courts have not

found that the transfers were not valid. *In re Crim*, 81 S.W.3d 764 (Tenn. 2002). A creditor or

purchaser who examines a deed of trust should be able to assume that if it contains an

acknowledgement to which a notary's seal is affixed, then it has been properly authenticated and

is valid, that is, free from apparent forgery or fraud…." *Id.* at 768 (quoting *In re Marsh*, 12

S.W.3d 449, 454 (Tenn.2000))

Mr. Spurling also signed almost all of the notes and deeds of trust executed in connection

with the purchase of these properties.  His signature was acknowledged by notaries without any

designation as a representative. The court should be able to rely on these acknowledgements as

conclusive on the question of whether the signer was the actual party to transaction; however, the court also notes that the practice of the notaries in this case could leave some question. But the court has more than just the notarized signatures on the deeds. Mr. Spurling also executed the loan documents for various properties without a representative designation. The Keys gave receipts to Charles Spurling. The tenants' first contact was with Mr. Spurling. One even testified he was surprised when he saw Mike's name on the tax statement, but when that tenant wanted to ask about the apparent discrepancy, he asked Mr. Spurling, not Mike, for an explanation.

The court does not find the Debtors' contention credible that all properties in the name of Charles (with no middle initial) are properties of Charles W.  The Debtor frequently used "Charles Spurling" in his business dealings.  He is named as "Charles Spurling, the father," on the power of attorney for Mike Spurling. Trial Ex. I, Power of Attorney.

No power of attorney for Charles W. Spurling was produced.  Charles W., having previously sworn he owned none of these properties, claimed these properties as his at trial. He testified that the reason his signature was not on any of the documentation except one was because he had to work and he always gave his father a power of attorney to sign on his behalf. He testified that his father or his attorney always called to ask permission before his father signed. However, there was not a single exhibit offered that showed Mr. Spurling as signing for Charles W. by power of attorney.  It was clear that at least one of the attorneys closing transactions for the Spurling family understood the significance. In the transaction involving the Pritchetts, both the deed and the acknowledgement reflect that Mr. Spurling was signing through a power of attorney.  Trial Ex. 22, Warranty Deed.

As further support for the court's conclusion that Mr. Spurling is the real party in interest in the land sale business, the court notes the demeanor of Mr. Spurling compared to his sons. Mr.

Spurling, despite his relatively little formal education, had a detailed knowledge of the properties, where they were located, how they were purchased and financed, the names of the tenants and the condition of the properties.  By comparison, both sons, the alleged owners of the properties, had trouble with the details and used a collection of photographs of the properties with the addresses written on the back of each photograph to answer the Trustee's questions. The court saw Mrs. Spurling hand Mike his pictures on his way to take the stand.  When asked about specific properties, both had to refer to the photographs to refresh their recollection of which property was the subject of the Trustee's questions.  Both sons believed that they needed their hourly jobs to support themselves.  Neither took any regular or identifiable income from the properties. Neither listed the income from or the expenses and depreciation related to the properties on their tax returns. Charles W. and his wife have previously represented under oath that they did not own these properties or receive this income.

Based on these findings of fact, the court will discuss the legal standards to be considered in determining whether the Debtors are eligible for a discharge.

## II.      Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district provide this court with jurisdiction to hear and decide this adversary proceeding.  The Trustee's action regarding the dischargeability of particular debts is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(J).

## III.     Analysis

### A.      Non-Dischargeability Pursuant to 11 U.S.C. § 727(a)(2)(A)

11 U.S.C. § 727(a)(2)(A) provides:

(a)  The court shall grant the debtor a discharge unless – . . .(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged

> with custody of property under this title, has transferred, removed, destroyed,
> mutilated, or concealed, or has permitted to be transferred, removed, destroyed,
> mutilated, or concealed –
> (A) property of the debtor, within one year before the date of the filing of the
> petition. . . .

11 U.S.C. § 727(a)(2)(A). The plaintiff must prove the elements of 11 U.S.C. § 727(a)(2)(A) by a preponderance of the evidence, and courts generally construe section 727(a) liberally in favor of the debtor. *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *see also, Roberts v. Oliver (In re Oliver)*, 414 B.R. 361, 373 (Bankr. E.D. Tenn. 2009).

In *In re Keeney*, the Sixth Circuit emphasized that § 727(a)(2)(A) encompasses two elements: 1) a disposition of property, such as concealment, and 2) "a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act of disposing of the property." 227 F.3d at 683 (quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)). The Sixth Circuit Bankruptcy Appellate Panel has determined that the term "concealment" in § 727(a)(2)(A) "includes the withholding of knowledge of an asset by the failure or refusal to divulge information required by law to be made known." *Buckeye Retirement Co., LLC, LTD. v. Swegan (In re Swegan)*, 383 B.R. 646, 655 (B.A.P. 6th Cir. 2008). The court finds that the ownership of numerous tracts of real property and their income was concealed by Mr. Spurling when he chose to put tracts of property in the name of "Charles Spurling" and then failed to disclose his ownership or control of properties for others. Both he and Mrs. Spurling concealed their beneficial use of the proceeds from these properties and their obligations on them.

The Debtors have not admitted a fraudulent intent so the court will have to consider the circumstantial evidence. In *Jahn v. Flemings (In re Flemings)* this court had the opportunity to discuss the determination of fraudulent intent through circumstantial evidence, including

evidence of "badges of fraud."  433 B.R. 230, 236 (Bankr. E.D. Tenn. 2010).  This court

recognized the following "badges of fraud":

> (i) the lack of adequate consideration for the transfer; (ii) the family, friendship,
> or close relationship between the parties; (iii) the retention of possessions, benefit,
> or use of the property in question by the debtor; (iv) the financial condition of the
> party sought to be charged prior to and after the transaction in question; (v) the
> conveyance of all of the debtor's property; (vi) the secrecy of the conveyance;
> (vii) the existence or cumulative effect of a pattern or series of transaction[s] or
> course of conduct after incurring of debt, onset of financial difficulties, or
> pendency or threat of suit by creditors; and (viii) the general chronology of events
> and transactions under inquiry.

*Id.* (quoting *Gordon v. Courtney (In re Courtney)*, 351 B.R. 491, 500 (Bankr. E.D. Tenn. 2006)).

Applying those badges to the case at hand, there appears to be no consideration paid by

Charles W. for his ownership in several of the properties if Mr. Spurling was truly acquiring the

properties for his son. In fact, Mr. Spurling signed the loan documentation to pay for those

properties.  The proceeds from these properties were deposited into another son's account, but

the Debtors had access to the proceeds whenever they needed or wanted anything.  There appears

to be no clear record keeping of the consideration conveyed between family members for the

transactions.  The sheer magnitude of the land sales business in which no family member is

claiming any portion of the cash flow generated by the business as their income and the

significant number of cash transactions calls into question the bona fides of the operation.  With

respect to the parties' financial condition, all of these operations for the last 8 years have been

conducted under the shadow of a lawsuit that ultimately resulted in a $1,000,000 judgment

against one of the Debtors. The fact that no creditors other than those litigants and their attorney

have even filed claims in this case except one pharmacy for an account of $2800 is also

circumstantial evidence that this entire case is an attempt to avoid the obligations of the

judgments and to keep family business outside of the bankruptcy proceeding.

To overcome the circumstantial evidence, the Debtors called three tenants to testify that they had contracted with Charles W.  Through their testimony they admitted they had contact with Mr. Spurling, as well as his sons Charles W. or Mike.  Trial Testimony of Linda Steader, March 15, 2011 at 1:27 p.m.; Trial Testimony of Buddy Arwood, March 15, 2011 at 1:37 p.m.; Trial Testimony of Joseph Quinn, March 15, 2011 at 1:52-1:54 p.m.  Although listed on the Debtors' witness list, no representative of their lenders Sloan or Key appeared at trial to support this story. Mr. Nolen was also listed as a witness, but he was not called to support the Debtors' or Charles W.'s contention that all of the references to Charles Spurling in the notes, deeds of trust and deeds referred to Charles W.  The Debtors' failure to disclose their business operations given the magnitude of the enterprise conducted, the impending personal injury trial, the failure to report any of these transactions on tax returns, the lack of accounting and the number of cash transactions brings the court to the conclusion that the Debtors were intentionally concealing these properties from their creditors.  The Trustee has sustained his burden of proof on his 11 U.S.C. § 727(a)(2)(A) objection.

**B.       Non-Dischargeability Pursuant to 11 U.S.C. § 727(a)(4)(A)**

The Bankruptcy Code provides that a debtor shall receive a discharge from the court unless "the debtor knowingly and fraudulently, in or in connection with the case – (A) made a false oath or account; . . ." 11 U.S.C. § 727(a)(4)(A).  Courts in this Circuit have determined that to state a claim pursuant to § 727(a)(4)(A), a plaintiff must demonstrate by a preponderance of the evidence the following five elements:

> (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) that the statement related materially to the bankruptcy case.

33

*Clippard v. Jarrett (In re Jarrett)*, 417 B.R. 896, 903 (Bankr. W.D. Tenn. 2009) (citing *In re Keeney*, 227 F.3d at 685).

Statements made by a debtor in his bankruptcy schedules, his personal statement of financial affairs, and at 341 meetings are all statements made under oath. *Noland v. Johnson (In re Johnson)*, 387 B.R. 728, 743 (Bankr. S.D. Ohio 2008) (citing *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999)) (other citations omitted). Whether a false statement under oath has been made pursuant to 11 U.S.C. § 727(a)(4)(A) is a question of fact. *In re Jarrett*, 417 B.R. at 903.

The Trustee contends that the Debtors have made false statements regarding the following:

1. *The statement in their schedules that there were no transfers of the Debtors' property within two years of the filing.*

The Debtors transferred an interest in their residence to their son Mike. Trial Ex. 4. The court finds this was a false statement. In addition, the court, having found that Mr. Spurling is the beneficial owner of the properties recorded in the name of "Charles Spurling," finds the transfers by Charles Spurling should also have been disclosed.

2. *The statement in the statement of financial affairs that the Debtors had no income for the years 2007 through 2009.*

Having found that the Debtors operated a land business that has generated significant income from which they have received the benefit, the court finds that the statement that they had no income is false. Trial Ex. 1.

3.  *The statement that the Debtors have not had sufficient income to necessitate filing*
    *income tax returns.*

The Debtors have received significant income from rent and land sales that would require tax

returns. The court finds that the Debtors' statement regarding their need to file tax returns to be

false.

4.  *The statement that the Debtors listed only one debt to Sloan and one debt to Key.*

Having found that properties and debts in the name of "Charles Spurling" belong to the Debtor,

Mr. Spurling owes over $250,000 to the Keys. Mrs. Spurling is still liable on a debt to Mrs. Key.

These debts were not disclosed. The amount owed to Sloan has not been determined. The court

finds the statement regarding the debts to the Keys to be false. While the court has some question

about the representations about Sloan, the court does not find that the Trustee has carried his

burden with respect to the statements about Sloan.

5.  *The statement that the Debtors own only 4 real properties.*

Having found that Mr. Spurling owns at least 9 other properties held in the name of Charles

Spurling and/or Carolyn Spurling, the court finds the Debtors' statement on Schedule D to be

false.

6.  *The omission of any disclosure that the Debtors have a beneficial ownership interest*
    *in properties held by Mike Spurling or Charles W. Spurling within two years of the*
    *petition date.*

The court does not find that the Trustee has proven that properties owned of record by Mike or

Charles W. Spurling were the Debtors' properties.  Due to the commingling of the funds and the

admitted distribution of some of the funds from the properties to Charles W. in cash and to Mike

through his checking account, the court cannot find that these statements are false by a

preponderance of the evidence presented.  Mr. Spurling's testimony about the joint venture with

the Jacks was not sufficiently rebutted by the Trustee.

> 7. *The statement at Mr. Spurling's deposition that the home was paid for, or in the*
>    *alternative the statements at trial that there are two deeds of trust on the home.*

The court finds that the Trustee has not proven that the deposition statement was false. At trial,

the Debtor seemed to change his position on whether his house was "paid for" but he did not

change his position about whether he had paid Mr. Lee.  He maintained that the he still owed

Household Financial over $40,000 and that he still owed Mr. Sloan over $40,000. The court has

noted a close question about whether there were false statements made about the amount of debt

still existing which is secured by their residence. The Debtors have made statements under oath

that express a range of debt possibly owed to Sloan ranging from $40,000 to $70,000, and a

range of debt owing to Household Finance of $40,000 to $50,000. The documents themselves

would lead the court to believe that the debts should be much less or satisfied by 2008; however,

the Trustee put on no proof other than the deposition testimony regarding what was owed and

therefore the court cannot find that he has carried his burden of proof with respect to whether the

statements about the amount of debt owed to Sloan and Household Finance are false. As to

representations from the alleged holders of the debt, the court has no further information since

neither creditor filed a claim in this case or appeared as a witness at trial.

With respect to the third element of knowledge required to demonstrate a false oath or

omission, " ' [k]nowledge that a statement is false can be evidenced by a demonstration that the

debtor knew the truth, but nonetheless failed to give the information or gave contradictory

information.' " *In re Flemings*, 433 B.R. at 239 (quoting *In re Courtney*, 351 B.R. at 506).  The

elements of knowingly and fraudulently must both be proven separately.  *See In re Oliver*, 414

B.R. at 374.  In this case, the court finds that the Debtors were clearly the parties with knowledge of the properties. That was apparent from Mr. Spurling's testimony. He was the center of the operation. Mrs. Spurling handled the money coming in by preparing the deposits, and the money going out as a signatory on the account. When they signed their schedules and statement of financial affairs, they were well aware of the number of properties they managed and the income and debts associated with those properties.

With respect to the element of intent, the Debtors did not admit their intent to make false oaths. The court must again look to circumstantial evidence based on the Debtors' course of conduct to infer the Debtors' intent.  *In re Flemings*, 433 B.R. at 236.  The court has already concluded that the Debtors intended to conceal their assets and found that their contention about the ownership of certain properties was not credible. With respect to this issue, a finding of fraudulent intent "is a question of fact that is highly dependent on the bankruptcy court's assessment of the debtor's credibility."  *Roberts v. Debusk (In re Debusk)*, No. 3:08-cv-427, 2009 WL 1256891, at *4 (E.D. Tenn. May 1, 2009).  An inference of deceitful intent may be found where the evidence demonstrates that a series or pattern of errors occurred.  *See General Motors Co. v. Heraud (In re Heraud)*, 410 B.R. 569, 581 (Bankr. E.D. Mich. 2009). In this case, the Debtors' pattern of omissions from their schedules of any role in the land sales business either as the owner or the manager allows the court to infer that there was deceitful intent. "If the trustee meets his burden of proof on the issue of intent, the burden shifts to the debtor to rebut the presumption."  *In re Flemings*, 433 B.R. at 240.

The Debtors' efforts to rebut the Trustee's proof have been weak.  The Debtors argue that they continued to acquire property after the lawsuit was filed. The only piece of property that the Debtors admit was acquired by them after the Wallis Creditor's lawsuit was conveyed to Mike.

37

*See* Trial Ex. 18. The Debtors' attorney argues that these are simple folk who are unaccustomed to sophisticated real estate transactions. The court finds that while they may not have had extensive formal education, they did manage and amass significant real estate holdings for their family. When they were buying and selling, they did know to go to attorneys to draft documents and have their signatures acknowledged. With Mike, Mr. Spurling also has a written power of attorney. The court finds the Debtors intended to make false statements.

Regarding the fifth element of materiality, "[t]he concealment of a potential preference action clearly bears a relationship to the bankrupt's estate." *In re Flemings*, 433 B.R. at 241. This concealment of the ownership of these properties bears a clear relationship to the estate as does the transfer of the interest in the home made to Mike and the denial that Mr. Spurling had an interest in properties in the name of "Charles Spurling."

In *In re Hamo*, the Bankruptcy Appellate Panel for the Sixth Circuit quoted a bankruptcy court regarding the purpose of § 727(a)(4)(A):

> The very purpose of . . . 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs.  The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction . . . . Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight.
> . . . .
> A discharge is a privilege and not a right and therefore the strict requirement of accuracy is a small quid pro quo.  The successful functioning of the bankruptcy code hinges upon the bankrupt's veracity and his willingness to make a full disclosure.

233 B.R. at 725-726 (quoting *Hillis v. Martin, Martin v. Martin (In re Martin)*, 124 B.R. 542, 545, 547-48 (Bankr. N.D. Ind. 1991)).

The Sixth Circuit explained in *In re Keeney* how courts should analyze section

727(a)(4)(A) claims:

> " 'Complete financial disclosure' " is a prerequisite to the privilege of discharge.
> The Court of Appeals for the Seventh Circuit has explained that intent to defraud
> "involves a material representation that you know to be false, or, what amounts to
> the same thing, an omission that you know will create an erroneous impression."
> A reckless disregard as to whether a representation is true will also satisfy the
> intent requirement.  " '[C]ourts may deduce fraudulent intent from all the facts and
> circumstances of a case.' " However, a debtor is entitled to discharge if false
> information is the result of mistake or inadvertence.  The subject of a false oath is
> material if it " 'bears a relationship to the bankrupt's business transactions or
> estate, or concerns the discovery of assets, business dealings, or the existence and
> disposition of his property.' "

227 F.3d at 685-86 (citing *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)) (quoting *Williamson
v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987); *Beaubouef v. Beaubouef (In re
Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)). The Trustee has shown by a preponderance of
the evidence that these Debtors knowingly and intentionally made a series of false oaths which
were material to this estate.

## IV.    Conclusion

The court finds that Mr. Spurling is the owner of the properties in which his full name or
the name of Charles Spurling appears. He and his wife enjoyed the financial benefits of these
real estate investments. He is the patriarch and chief operating officer of the family business. He
and his wife deliberately withheld any reference to the transactions of the land sale business or
transactions with family members. He testified that he omitted family transactions because as he
told the Trustee, "Sir, that's some accounting family business and I didn't think that was
supposed to be involved."  The court strongly disagrees with Mr. Spurling's assessment of what
should be involved in bankruptcy disclosures.

Analysis of the various documents related to the titles of the properties owned and operated by the Defendants, the disbursements to both Carolyn and Charles J. Spurling from Mike Spurling's account, as well as a review of their bankruptcy schedules, their credibility, and Mr. Spurling's testimony involving ownership of the properties shows that the Debtors concealed properties knowingly and with intent to mislead their creditors.  Further by failing (1) to reflect either their management of the properties for others or (2) to disclose the ownership and income from the properties, the Debtors made false oaths in an attempt to avoid disclosure of "the reality of their affairs."

The Trustee has proven both his § 727(a)(2)(A) claim and his § 727(a)(4)(A) claim by a preponderance of the evidence.  The Debtors are not entitled to a discharge.

A separate order will enter.

# # #